RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0114p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LANCE POUGH,

*Plaintiff-Appellant,*

No. 04-3863

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 03-00697—Solomon Oliver, Jr., District Judge.

Argued: February 1, 2006

Decided and Filed: March 31, 2006

Before: RYAN, CLAY, and GILMAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Spiros P. Cocoves, Toledo, Ohio, for Appellant. Robert J. Becker, ASSISTANT UNITED STATES ATTORNEY, Akron, Ohio, for Appellee. **ON BRIEF:** Spiros P. Cocoves, Toledo, Ohio, for Appellant. Robert J. Becker, ASSISTANT UNITED STATES ATTORNEY, Akron, Ohio, for Appellee.

GILMAN, J., delivered the opinion of the court, in which RYAN, J., joined. CLAY, J. (pp. 10-13), delivered a separate dissenting opinion.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. Lance Pough, a federal prisoner who first pled guilty to federal drug charges and later to a state murder charge, appeals the denial of his § 2255 motion to vacate his sentence. He contends that the two lawyers who represented him during the course of his plea proceedings in the district court, as well as his court-appointed appellate counsel on direct appeal, all rendered constitutionally ineffective assistance. Pough asserts that this entitles him to vacate his guilty plea or, at a minimum, to an evidentiary hearing. In response, the government maintains that none of the three lawyers performed deficiently, and that the district court should never have addressed the merits of Pough's case because his motion was untimely. For the reasons set forth below, we **AFFIRM** the judgment of the district court without reaching the government's argument as to timeliness.

1

# I. BACKGROUND

Pough was arrested on May 28, 1999, arraigned that same day, and bound over to the grand jury the following week. Attorney Dennis Terez represented Pough at the arraignment, but Pough retained attorney Charles Mickens to appear on his behalf shortly thereafter. When Pough was subsequently indicted on one count of conspiracy to distribute both powder and crack cocaine, and on three counts of distributing those two substances, Mickens withdrew as counsel of record. Jacqueline Johnson of the Federal Public Defender's Office was then appointed to represent Pough on June 29, 1999.

In the summer and fall of 1999, Johnson entered into plea negotiations with Assistant U.S. Attorney Robert Becker on Pough's behalf. Becker sent Johnson a letter in August of 1999 to express the government's interest in meeting with Pough for an off-the-record proffer session. The letter sent by Becker explained that, while no statement made by Pough during the session would be used in the government's case-in-chief in any criminal matter, "the government may make derivative use of any information which [Pough] provides and may pursue investigative leads suggested by statements or other information which he provides."

In a letter dated September 16, 1999, Becker made a preliminary plea offer to Johnson, estimating that Pough would be sentenced to 14 years in prison, with a reduction of up to 2 years for good behavior. Pough, however, had previously contacted Becker and a state law-enforcement official to express his desire to cooperate in exchange for the government's promise to move for a subsequent reduction in his sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure. Subject to certain limitations, Rule 35(b) permits a district court to reduce the defendant's sentence if the government indicates in a motion that the defendant has provided "substantial assistance in investigating or prosecuting another person."

Becker informed Johnson that Pough had contacted him directly, and Johnson responded on September 22, 1999 with a stern letter to Pough. In relevant part, Johnson told Pough:

> . . . I cannot stress enough that you must not have direct contact with [Becker] or any law enforcement officer without advice and notice to your counsel. I advised you in our last conversation that you should rely upon the advice of your state appointed counsel regarding your desire to cooperate. I advised [Becker] that you must have counsel because of the possibility of implicating yourself in uncharged state criminal offenses.
>
> Instead, you ignored my advice and directly contacted the prosecutor to inform him that you want to cooperate. You've received direct advice from your state appointed counsel, not to make any further statements to the local law enforcement officers. If you continue to disregard my advice regarding your case, you may complicate and jeopardize the plea negotiations that I have already pursued with [Becker].

According to Pough's affidavit, he spoke to Johnson repeatedly after the government made its initial plea offer, expressing his desire to accept the plea agreement so long as he could secure a later reduction in his sentence via a motion brought by the government under Rule 35. Pough admits that he "would not accept the 1st plea of 14 years, unless [he] received a Rule 35 motion with it." At that point, the government had not included the possibility of such a motion in the plea agreement itself, and Becker's letters to Johnson on this issue indicated only that he "would be willing to consider a Rule 35 motion at a later date, depending on what deal [Pough] is able to make with, and what value [Pough] is to, the state authorities." Pough rejected the government's offer.

Sometime prior to October 4, 1999, the government hardened its position. Although the record does not contain Becker's October 4th letter to Johnson, Becker recounted the content of that letter in subsequent correspondence with Johnson. According to Becker, the government learned at some point that the state of Ohio was preparing to indict Pough for the murder of Brad McMillan, an informant for the Bureau of Alcohol, Tobacco, and Firearms who was scheduled to testify against Pough on drug-related charges pending in state court. Becker claimed that, consistent with ethical principles, he could not ignore that information and would have to include the murder as relevant conduct for the purposes of Pough's sentencing, thus exposing Pough to a potential life sentence in federal prison in addition to a possible death sentence under state law.

In his October 4, 1999 letter, and again in a letter dated January 31, 2000, Becker outlined a "best case scenario" under which Pough would plead guilty in both state and federal court, receive credit for accepting responsibility and assisting the government in other prosecutions, and would serve his federal and state sentences concurrently in federal facilities. Becker also addressed Pough's concern that the only basis for the state charges was information that Pough had provided to federal authorities during the proffer session, explaining that state and federal authorities knew about the murder prior to the proffer and that derivative evidence (which the proffer agreement expressly allowed the government to use) "substantiated what the investigation previously produced."

Pough appeared before the district court on February 14, 2000 and entered a plea of guilty to the one conspiracy count. After entering his plea, Pough again changed counsel, retaining attorney Edwin Vargas, who entered an appearance on April 10, 2000. Vargas sought to continue the sentencing hearing in order to investigate Pough's allegations that the authorities had violated the proffer agreement and to decide whether Pough should withdraw his plea.

The sentencing hearing was eventually held on July 19, 2000. Vargas informed the district court that he had reviewed the plea agreement with Pough and had answered all of the questions that Pough had regarding that agreement. The district court then explained to Pough the details and consequences of his agreement with the government, including his waiver of his rights to appeal and to seek habeas corpus relief. After accepting the plea agreement, the court sentenced Pough to 204 months (17 years) in prison, the sentence to run concurrently with his state sentence for murder. In addressing the court, Pough told the district judge:

> I'm glad I got the deal that I got, your Honor, because I feel I got it off my chest, and I did what I felt was best . . . During this process, I know it didn't go exactly like I thought it was going to go, and things didn't go in favor for me like I thought they were going to, but I feel confident in what went on.

Notwithstanding the plea agreement's waiver of his right to appeal, Pough filed a notice of appeal anyway, and attorney Richard Lillie was appointed by the district court to represent him. Lillie subsequently filed an *Anders* brief in this court and sought permission to withdraw from the case. In an unpublished order, this court granted Lillie's motion to withdraw, noted that he had "filed an acceptable *Anders* brief," and found that "[c]ounsel reviewed the record and properly concluded that no relief is warranted." Rejecting all of Pough's challenges as meritless, this court summarily affirmed his sentence. The mandate issued on October 11, 2001.

Pough's next move was to collaterally attack his conviction and sentence under 28 U.S.C. § 2255, which permits district courts to vacate, set aside, or correct sentences in federal cases. On September 29, 2002, Pough petitioned the district court for an extension of the limitations period within which to file for relief under § 2255. Pough's motion was submitted just 13 days before the one-year statute of limitations period under § 2255 would have expired. The district court denied Pough's request for an extension, but Pough proceeded to file his § 2255 motion anyway on April

16, 2003. In response, the government argued that Pough's motion was untimely. The district court agreed, and therefore granted the government's motion to dismiss on May 30, 2003.

Pough then asked the district court to reconsider its decision to dismiss his § 2255 motion, citing the Second Circuit's decision in *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001), for the proposition that courts can construe a pro se petitioner's written request to extend the filing deadline as the § 2255 motion itself. The district court ultimately agreed that Pough's September 29, 2002 letter to the court, when construed liberally, sufficed as a motion under § 2255. This caused the district court to reinstate the motion. The court nevertheless denied Pough relief on the merits, concluding that neither his trial nor his appellate counsel had rendered constitutionally ineffective assistance. This appeal followed.

## II. ANALYSIS

### A.      Standard of review and legal framework

We review de novo the denial of a federal prisoner's motion to vacate, set aside, or correct a sentence, but will overturn a district court's factual findings only if they are clearly erroneous. *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003). A claim of ineffective assistance of counsel presents a mixed question of law and fact that we likewise review de novo. *Mallett v. United States*, 334 F.3d 491, 497 (6th Cir. 2003). Finally, we will reverse a district court's decision not to hold an evidentiary hearing only if that court abused its discretion. *Williams v. Bagley*, 380 F.3d 932, 977 (6th Cir. 2004).

A prisoner seeking relief under § 2255 "must allege as a basis for relief: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Mallett*, 334 F.3d at 496-97 (citation omitted). In the present case, Pough alleges that his constitutional right to the effective assistance of counsel was violated, placing his claim within the first of the three categories listed above. Pough must prove his allegation that his lawyers were constitutionally ineffective by a preponderance of the evidence. *See McQueen v. United States*, 58 F. App'x 73, 76 (6th Cir. 2003) (unpublished) ("Defendants seeking to set aside their sentences pursuant to 28 U.S.C. § 2255 have the burden of sustaining their contentions by a preponderance of the evidence."); *see also Wright v. United States*, 624 F.2d 557, 558 (5th Cir.1980) ("In a section 2255 motion, a petitioner has the burden of sustaining his contentions by a preponderance of the evidence.").

### B.      Even though Pough's § 2255 motion may have been untimely, this court need not reach the issue because the motion fails on the merits

Although the government did not cross-appeal the district court's decision to amend its earlier judgment, the government argues that the district court erred by accepting Pough's § 2255 motion as timely filed. The government maintains that federal courts lack jurisdiction over motions to extend the filing deadline for relief under § 2255 because the court does not acquire jurisdiction over the petitioner's case until the § 2255 motion itself is filed. Under that theory, the district court erred in construing Pough's extension request as a § 2255 motion. Furthermore, because the § 2255 motion itself was not filed until April of 2003, well after the limitations period had run, the government contends that the § 2255 motion was untimely and should have been dismissed.

The government correctly notes that this circuit has not yet endorsed the approach adopted by the Second Circuit in *Green,* 260 F.3d at 83. In addition, the government may also be correct that, even assuming that this court would follow *Green*, the decision of the district court to construe Pough's motion to extend time as the § 2255 motion itself constitutes an unwarranted extension of *Green*.

We need not address these concerns, however, because the one-year statute of limitations for filing a  motion under § 2255 is not jurisdictional. *See Dunlap v. United States*, 250 F.3d 1001, 1004-05 (6th Cir.2001) (holding that the statute of limitations in § 2255 is not a jurisdictional bar and that equitable tolling is therefore available); *see also Barnard v. Conley*, 36 F. App'x 813, 816 (6th Cir. 2002) (unpublished) (Ryan, J., concurring in the judgment) (refusing to reach a timeliness issue not raised below because "the one-year period of limitations found in § 2255 and applicable to § 2254 is not a jurisdictional requirement," and instead deciding the case on the merits of the petitioner's ineffective-assistance-of-counsel claim).  Whether Pough has complied with the limitations period is therefore not an issue that we have to decide as a threshold matter, as we would have to do if satisfying the limitations period were a jurisdictional prerequisite.  *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94-95 (1998) (holding that federal courts must assure themselves that they have subject matter jurisdiction before addressing the merits of a suit).

We may instead proceed directly to the merits of Pough's case, which can be resolved in a straightforward manner and will also result in the denial of his motion.  As explained in a concurring opinion from the Eleventh Circuit,

> a district court is not required to rule on whether an asserted statute of limitations bar applies if the § 2255 motion may be denied on other grounds.  Sometimes it will be easier for a court to deny relief on the merits than to figure out the issues relating to the statute of limitations.  Nothing in the statute prohibits a court from proceeding in that way . . . .

*Aron v. United States*, 291 F.3d 708, 718 (11th Cir. 2002) (Carnes, J., concurring).  We agree.  Furthermore, two district judges in the Eastern District of Michigan have recently interpreted the caselaw regarding the § 2255 limitations period as permitting them to reject § 2255 motions on the merits even if the filings were possibly untimely.  *See Holman v. Cason*, No. 04-CV-60087-AA, 2005 WL 2313879, at *4 (E.D. Mich. Sept. 22, 2005) (unpublished) (declining "to dismiss [the] Petitioner's habeas petition on the basis of the statute of limitations because it [was] easier to deny relief on the merits than to figure out the issues relating to the statute of limitations") (citation and quotation marks admitted); *Crew v. Cason*, No. 04-CV70841-DT, 2005 WL 2123729, at *4 (E.D. Mich. Aug. 31, 2005) (unpublished) (same).  We will follow the same course in this appeal, and will now turn to Pough's ineffective-assistance-of-counsel claims.

**C.      The district court correctly determined that Pough's trial counsel did not render ineffective assistance**

Under the familiar standard announced in *Strickland v. Washington*, 466 U.S. 668 (1984), Pough must prove that (1) his trial "counsel's representation fell below an objective standard of reasonableness," *id.* at 687-88, and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  The Supreme Court has modified *Strickland*'s prejudice prong in the context of guilty pleas, holding that a defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and instead would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

In evaluating whether an attorney's performance was constitutionally deficient, we recognize "that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  We "also must not indulge in hindsight, but must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors." *McQueen v. Scroggy*, 99 F.3d 1302, 1311 (6th Cir. 1996), *overruled on other grounds, In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004) (en banc).  Defendants alleging the ineffective assistance of counsel bear "a heavy

burden of proof." *Whiting v. Burt*, 395 F.3d 602, 617 (6th Cir. 2005). A defendant challenging his attorney's conduct during plea bargaining, moreover, "must show that counsel did not attempt to learn the facts of the case and failed to make a good-faith estimate of a likely sentence. He must also show that his lawyer's deficiency was a decisive factor in his decision to plead guilty." *United States v. Cieslowski*, 410 F.3d 353, 358-59 (7th Cir. 2005).

Pough's motion fails under the first prong of the *Strickland/Hill* analysis. First and foremost, Pough has not provided any evidence that either of the attorneys handling his guilty plea—Johnson or Vargas—performed below an objective standard of reasonableness. The bulk of Pough's contentions concern Johnson, whom Pough says performed deficiently by advising him not to provide information about drug-related homicides in Youngstown, Ohio without first reaching an agreement with the government as to a reduction in his sentence. Johnson's allegedly faulty advice, Pough maintains, was a product of her failure to investigate the facts underlying the Youngstown crimes, which purportedly led her to believe that Pough was a suspect in those crimes.

Given the strong presumption that attorneys "render[] adequate assistance and ma[k]e all significant decisions in the exercise of reasonable professional judgment," *Strickland*, 466 U.S. at 690, the record contains ample indications that Johnson acted in accordance with applicable professional standards. Although Pough chides Johnson for failing to ascertain whether he was a suspect in the Youngstown crimes, the record is devoid of any indication that Johnson's advice to Pough had anything to do with whether or not he was implicated in the Youngstown crimes. Rather, Johnson told Pough in the September 22, 1999 letter to "rely upon the advice of [his] state appointed counsel regarding [his] desire to cooperate."

Because that attorney had not yet secured a plea agreement on the pending state charges, and because Pough's knowledge of the Youngstown crimes might have been a valuable bargaining chip during negotiations with the state, Johnson could reasonably have concluded that Pough should not reveal such valuable information in the mere hope of later obtaining relief under Rule 35. This is especially true because the government did not guarantee relief under Rule 35, but said only that it would "consider" such a motion after state officials acted. In sum, the tactical decision of a criminal defense lawyer that her client should cooperate only *after* a deal is on the table is not objectively unreasonable. *Cf. Buell v. Mitchell*, 274 F.3d 337, 360 (6th Cir. 2001) ("To the extent that Buell believes his counsel should have undertaken a different strategy in conducting the investigation and determining how best to advocate on Buell's behalf, these are tactical decisions that cannot form the basis for an ineffective assistance claim.").

Johnson's advice to Pough made eminent sense for at least two other reasons. The first is that Pough himself repeatedly reaffirmed that he would accept the government's original plea offer *only* if the government promised him relief under Rule 35. But there was never a guarantee that the government would offer to make a subsequent Rule 35 motion, or, if it did, that it would do so on the basis of information about the Youngstown crimes. The government, after all, acknowledged throughout the negotiations that it was interested in "the murder of Brad McMillan in Warren, not [the] Youngstown homicides."

Secondly, Johnson advised Pough in her September 22, 1999 letter that his state-appointed counsel had already instructed him "not to make any further statements to local law enforcement officers." When she advised Pough not to provide information about the Youngstown crimes to state officials, therefore, Johnson was simply reiterating advice previously given by Pough's defense attorney in the state-court proceedings, the latter attorney being more familiar with the advantages and disadvantages of revealing the relevant information at that time.

Because Johnson did not render ineffective assistance, Vargas as successor trial counsel did not act unreasonably in failing to raise Johnson's performance as an issue during sentencing.

Vargas's initial motion to continue the sentencing hearing was based on his need for more time to discuss with Pough whether the latter should withdraw his guilty plea, and also for more time to investigate whether Pough's previous attorney had permitted statements made during the proffer session to be misused. Absent evidence to the contrary, we will assume that Vargas carried out the necessary investigations, *see Strickland*, 466 U.S. at 690, an assumption that is corroborated by Vargas's statement during the hearing that he had "addressed every one" of Pough's earlier concerns regarding his guilty plea.

In addition, Pough unrealistically overestimates the relief that Vargas could have obtained for him had Vargas convinced the district court to withdraw the guilty plea on the basis of Johnson's actions. Pough argues that Vargas could have "raised the claim against Johnson to reinstate the first plea of 14 years and pave the way for the government to request a Rule 35 motion from the district court." But by the time Vargas entered the fray, the government was well aware of the state's having charged Pough with the McMillan murder, and it was no longer willing to offer Pough a plea bargain that did not account for the murder as relevant conduct. Vargas, therefore, did not act unreasonably in failing to raise Pough's unsubstantiated allegations that Johnson had rendered ineffective assistance during the plea negotiations.

Finally, the present case is not one in which defense counsel failed to transmit to the defendant a plea offer by the government, failed to explain to the defendant the potential length of his sentence if he proceeded to trial, or failed to inform the defendant of parole eligibility. *See Griffin v. United States*, 330 F.3d 733, 738-39 (6th Cir. 2003) (holding that defense counsel performed deficiently by not informing the defendant of the government's plea offer, and remanding for an evidentiary hearing on the prejudice prong); *Smith v. United States*, 348 F.3d 545, 553-54 (6th Cir. 2003) (remanding for an evidentiary hearing where the record was unclear as to whether counsel adequately informed the defendant of the consequences of going to trial); *Sparks v. Sowders*, 852 F.2d 882, 885 (6th Cir. 1988) (holding "that gross misadvice concerning parole eligibility can amount to ineffective assistance of counsel"). To the contrary, Pough's two attorneys in question, and Johnson in particular, promptly transmitted to Pough the government's plea offers, coordinated a global plea agreement with his state-appointed counsel, and ultimately obtained for Pough what can be described only as an immensely favorable deal under the circumstances. Pough received concurrent federal and state sentences, and will spend the entire 17-year term of his sentence in federal prison, instead of spending approximately 14 years in federal prison and then facing either a death sentence or a lengthy term of incarceration in state prison. Because neither Johnson nor Vargas performed below an objective standard of reasonableness, we need not reach *Strickland*'s prejudice prong.

### D.     The district court correctly determined that Pough's appellate counsel did not render ineffective assistance

Pough next contends that his appellate counsel, Richard Lillie, rendered ineffective assistance, an argument that we find to be without merit. To start with, Pough's plea agreement waived his right to appeal his sentence unless that sentence was beyond the statutory maximum, and he acknowledged his waiver of that right during the sentencing hearing. Despite the plea agreement's waiver of appellate rights, Pough proceeded to file an appeal, and Lillie was appointed by the district court to represent him. This court then authorized Lillie to withdraw after Lillie filed an acceptable *Anders* brief, to which Pough had a chance to respond.

Pough's primary argument is that Lillie provided ineffective assistance by failing to argue on direct appeal that the government and the state of Ohio had breached the federal plea agreement by using Pough's statements to implicate him in the McMillan murder. As the district court correctly concluded, however, this court on direct appeal would not have had the authority to vacate Pough's state-court conviction. Indeed, even had this court agreed with Pough that his

*federal* conviction and sentence needed to be reversed, that judgment would have left the state-court judgment intact. Pough would have had to attack this latter judgment through a petition for a writ of habeas corpus under 28 U.S.C. § 2254. *See Smith v. United States*, 262 F.3d 537, 540 (6th Cir. 2001) (requiring a § 2255 petitioner challenging sentencing enhancements imposed because of state convictions to challenge those convictions either in state court or under § 2254)*; see also Singleton v. Norris*, 319 F.3d 1018, 1023 (8th Cir. 2003) (en banc) ("[Section] 2254 is the only means by which 'a person in custody pursuant to the judgment of a State court' may raise challenges to the validity of his conviction or sentence or to the execution of his sentence.").

This court's decision in *Warner v. United States*, 975 F.2d 1207 (6th Cir. 1992), is not to the contrary. In *Warner*, the defendant challenged two guilty pleas that he had entered within a ten-day period, one in state court and the other in federal court. Warner argued that the ineffective assistance he had allegedly received from his trial counsel prevented him from understanding the sentences to which he was subjected, so that his pleas in both cases were involuntary. *Id.* at 1209-10. The district court granted relief as to Warner's state-court convictions, but denied relief on the federal convictions. This court affirmed. In doing so, the court acknowledged that it had jurisdiction over Warner's two separate claims under § 2254 *and* § 2255. *Id.* at 1208. That is, the federal courts could grant Warner relief on his state-court guilty plea only because he had filed a petition for habeas corpus pursuant to § 2254. *See id.* at 1214-15. The *Warner* decision, therefore, actually supports Lillie's refusal to argue on direct appeal before this court that Pough's guilty plea in the Ohio state court should have been vacated due to an alleged breach of the plea agreement.

Moreover, Lillie reasonably concluded that Pough could produce no facts to support his allegation that the federal and state governments had duped him into providing the only evidence that could link him to the McMillan murder. Although the record is somewhat meager on this point, the correspondence provided by the parties indicates that Assistant U.S. Attorney Becker responded to Pough's concerns in a letter to Johnson dated January 31, 2000. Becker assured Johnson that the majority of the facts underlying the charges against Pough were known prior to his arrest, and that statements made during the proffer did nothing more than lead to derivative evidence that "substantiated what the investigation previously produced." Because Pough has offered no information to contradict the government's characterization of the relevant evidence, Lillie did not act in an objectively unreasonable manner for refusing to raise this claim.

### E.     Pough's appointed counsel before this court

Although we appreciate our dissenting colleague's concern with the performance of the attorney appointed to represent Pough before this court, we respectfully disagree with his characterization of counsel's actions and with his ultimate conclusion that Pough has been prejudiced. Faced with a barrage of questions at oral argument, Pough's appointed counsel informed the court that Pough had demanded that counsel proceed in the manner described in the dissent—that is, permitting Pough to take the lead role in drafting his appellate brief. Counsel explained that he had received a "great number of telephone calls and letters" from Pough, and that he normally did not have clients "quite as insistent as Mr. Pough."

The record bears out counsel's description. First, the record indicates that present counsel is the sixth attorney to represent Pough in the past six years. We do not pass judgment on the wisdom or propriety of these changes in counsel, but do note that such decisions reflect a pattern of Pough's dissatisfaction with his legal representatives and their approach to his case. The record also contains examples of Pough's frequent letters to his court-appointed counsel on direct appeal, from whom Pough repeatedly requested affidavits and interview notes that simply did not exist. These documents lend credibility to counsel's description of Pough as an insistent, strong-willed client who desired to micromanage the actions being taken on his behalf.

So insistent was Pough in controlling his own case that he filed a motion on April 25, 2005 to dismiss his court-appointed counsel and proceed pro se in the present appeal. This court denied that motion, notwithstanding Pough's success at the district-court level, where he had convinced the court to accept his § 2255 motion despite the government's argument that it was untimely. In our view, all of these factors confirm that Pough obtained the legal assistance that he desired and that he received constitutionally sufficient aid from his court-appointed attorney.

Most importantly, we do not believe that counsel's acquiescence in Pough's preferred course of action has prejudiced Pough. Counsel was asked at oral argument whether, if he had independently examined the record and identified the issues from the outset, he would have made additional arguments not contained in the briefs that we received. He replied that he would not have. Moreover, and lest there be any doubt on this point, counsel did far more in this appeal than simply format the briefs and appear for oral argument. Pough's primary and reply briefs are not, as the dissent appears to argue, devoid of citations to the relevant authorities, or an unorganized series of factual arguments. To the contrary, many of the authorities that we have cited in the preceding pages, and almost all of the arguments that we have rejected, are ones that were made in the two appellate briefs and were supported by citation to relevant statutes and cases.

Defense counsel also supplemented the briefs by providing this court, pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure, updated citations prior to oral argument. Under these circumstances, we disagree with the dissent's assessment that counsel "has abdicated his duties as Petitioner's legal representative," and conclude that, even if defense counsel misunderstood his role and should not have adapted his performance to the wishes of his client, counsel's conduct has neither prejudiced Pough nor impugned the appellate process. We also disagree, needless to say, with the dissent's characterization of our opinion as "startling," "audacious," "irrelevant," "puzzling," "a sham," "inexplicable," and as creating a "bait and switch scenario." These words, in our humble opinion, turn far more heat than light on the issues before us.

## F.    Publication of opinion

Finally, we disagree with our dissenting colleague's decision to have this opinion published. After oral argument, Pough filed a pro se motion asking this court *not* to publish the disposition of his appeal. He expressed in that motion fear that his "status" as a cooperating witness "will be revealed and put [him] in danger in this prison." Given the serious and violent criminal activities in which Pough was admittedly involved, we took his concerns at face value and were prepared to resolve the straightforward merits of his appeal in an unpublished opinion that, although available to those with access to online resources or law libraries, would not have appeared in the Federal Reporter. We continue to believe that the potential risk to Pough's safety outweighs the necessity of airing the disagreement among the members of this panel about whether Pough's appointed counsel acted so ineffectively as to deprive us—and Pough—of the resources necessary to properly decide this case.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

––––––––––––––––

**DISSENT**

––––––––––––––––

CLAY, Circuit Judge, dissenting.  It is entirely inappropriate to reach the merits of Petitioner's case when this Court knows full well that Petitioner's court-appointed counsel has abdicated his duties as Petitioner's legal representative.  Counsel admitted as much in briefs to this Court, during oral arguments, and again in a letter to the panel.

This Court ordered appointment of counsel to assist Petitioner in his appeal to this Court of the district court's refusal to vacate or set aside his convictions and sentence pursuant to 28 U.S.C. § 2255.  Attorney Spiros Cocoves was thereby appointed in March 2005; counsel's appointment was pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A *et seq*.  *See* Janice E. Yates, Chief Deputy Clerk, *Letter to Spiros P. Cocoves*, March 4, 2005 ("Thank you for accepting the court's appointment to represent petitioner . . . . [T]he court appreciates your undertaking to provide the representation afforded by the Criminal Justice Act . . . .").  This appointment is understood to create the usual attorney-client relationship between counsel and the indigent petitioner, with all the ethical considerations and duties of representation attendant thereto.  *See Ferri v. Ackerman*, 444 U.S. 193, 205 (1979) ("[T]he essential office of appointed defense counsel is akin to that of private counsel . . . .")

Petitioner's brief in this case conforms to the technical requirements of Sixth Circuit rules.  Significantly, however, the brief, although signed by counsel, is not a *brief by counsel*.  Counsel admitted as much in the brief itself.  In footnote 1 on page 3 of Petitioner's brief, counsel states that "[t]he bulk of this brief has been prepared by [Petitioner], with counsel assisting to conform the brief to the mandates of the federal appellate rules and this Court's local rules." (Pet'r Br. 3.)  It is further apparent from a reading of the brief that counsel formatted the brief, wrote a statement of the case, and perhaps wrote the prefatory sections for summary of argument and standard of review.  The argument section, however; was apparently not prepared by counsel.  The argument section proceeds in a *pro se* fashion, with very little legal structure and analysis.

Counsel for Petitioner further admitted his abdication of his role as Petitioner's attorney during oral arguments to this Court.  Counsel stated that he did not substantively draft the brief but "reviewed what [Petitioner] said against the record" and "made sure that the claims that [Petitioner] advanced were proper.*"  Oral Arguments Before the Sixth Circuit*, No. 04-3863, Feb. 1, 2006.  Surely this is not the advocacy involving independent professional judgment which we demand of counsel when claims are, at minimum, nonfrivolous, which counsel has admitted they are in the instant case.  Counsel admitted that this was "not the way I normally do things," but excused himself by stating that the order appointing Mr. Cocoves as counsel was somehow unusual or out of the ordinary.  *Id.*  Counsel refers to the order granting Petitioner a certificate of appealability in this matter, in which this Court stated that "counsel is hearby appointed to assist in the briefing of these issues."  *See Pough v. United States*, No. 04-3863 (6th Cir. Jan. 12, 2005).  Counsel inexplicably argues that he interpreted this order as placing him in a role somewhat analogous to "standby counsel" to Petitioner.  *Oral Arguments*.  Counsel repeated this contention after oral arguments in a letter to the panel:

> Because the order did not state that counsel was to be appointed to represent Mr. Pough, I read the order to mean that my role was to ensure that all filings comported with the Court's rules regarding format and that it otherwise present [sic] the issues, with Mr. Pough providing the bulk of the written work.

Spiros Cocoves, *Letter to the Honorables Eric L. Clay, Ronald Lee Gilman, and James L. Ryan, United States Court of Appeals for the Sixth Circuit*, February 2, 2006.

I have reviewed the order appointing counsel and found nothing unusual or different about this order versus other orders from this Court appointing counsel under the Criminal Justice Act. The order granting the certificate of appealability states that "counsel is hereby appointed to assist in the briefing of these issues." *Pough v. United States*, No. 04-3863 (6th Cir. Jan. 12, 2005). Moreover, I have reviewed the letter sent from the Clerk's office to Mr. Cocoves confirming his appointment, which thanks counsel for "accepting the court's appointment to represent the petitioner . . . [under] the Criminal Justice Act." *Letter to Spiros P. Cocoves*. Again, counsel's appointment was entirely standard. Surely, if counsel felt that the appointment was somehow unusual, counsel had an affirmative obligation to request clarification or confirmation from this Court. Counsel himself appears uncomfortable with his performance in this representation, stating during oral argument that he "probably [has] more agreement than I should have with what the Court's saying [about his representation]." *Oral Arguments*.

The majority opinion sets forth a rather startling and audacious *Apologia* for counsel's totally inadequate performance as a lawyer on Petitioner's behalf — a performance which should perhaps best be characterized as an "absence of performance." The majority opinion jumps through all manner of hoops in an attempt to obfuscate the obvious fact that Petitioner's counsel has admitted, on more than one occasion, and in writing, that he did not prepare Petitioner's brief on appeal to this Court but, on the contrary, merely formatted the brief drafted by Petitioner so that it would be in a form acceptable for filing with the clerk's office. The fact that Petitioner's counsel subsequently submitted a rule 28(j) letter, based not on counsel's work but as a follow-up to a brief drafting process in which counsel did not participate, except to format Petitioner's *pro se* brief, does not in the least mitigate counsel's abdication of his professional responsibility.

The majority opinion reflects a fundamental misunderstanding of the significance of the role of counsel in our adversary process. Once this Court appointed counsel for Petitioner, Petitioner was entitled to competent counsel who would represent Petitioner based upon an acceptable level of independent judgment, professional skill, and diligence. The majority opinion seeks to excuse counsel's abdication of his role as Petitioner's counsel based upon the irrelevant rationale that Petitioner has had several attorneys represent him in the past and because the majority seems to believe that letters from Petitioner to his prior counsel identify Petitioner as a difficult client. Based upon the majority's rationale, the quality of representation to which a person is entitled would depend to some extent on that person's personal characteristics as a client. Actually, none of the things mentioned by the majority have anything to do with the issue of whether our panel should have vacated attorney Cocoves' appointment and appointed a new lawyer who would have actually been willing and able to draft an appellate brief on Petitioner's behalf. In fact, the majority, in its anxiousness to excuse Petitioner's counsel's lack of performance, even engages in the puzzling conjecture, without any factual basis or foundation, that "Pough obtained the legal assistance that he desired."

Until and unless counsel approaches this Court to say that Petitioner has somehow prevented counsel from doing his job, counsel has a professional obligation to lend his analytical skills and legal knowledge, not just his formatting capabilities, to advance Petitioner's arguments. Attorney Cocoves' own bar demands as much. *See* Ohio Code Prof. Resp. Ethical Canon 7-19 ("The duty of a lawyer to his client and his duty to the legal system are the same: to represent his client zealously within the bounds of the law.") I believe that the circumstances surrounding counsel's role are very clear. By counsel's own admission, counsel had little role in preparing Petitioner's brief and framing Petitioner's arguments on appeal. Until and unless counsel makes a motion to this Court asking to be relieved of his responsibilities as counsel of record, counsel is under a professional obligation to advance Petitioner's arguments. To file and sign a brief with this Court which admits

on its face that counsel did little more than format the brief belies counsel's duty as an attorney, violates Court rules and canons of ethics, and undermines this Court's authority. It was this Court, after all, which appointed counsel in the first instance.

I acknowledge that Petitioner is not constitutionally entitled to assistance of counsel on habeas. *See generally Coleman v. Thompson*, 501 U.S. 722, 756 (1991). Yet this Court routinely appoints counsel in such cases where the Court determines that the assistance of counsel would aid the Court in its decision-making. Having made the determination to appoint counsel, the majority is wrong to convert the Court's decision-making process into a sham and now conclude that it can decide the merits of this case without Petitioner being afforded the assistance of counsel. By doing so, the majority is, in essence, contradicting a prior order of this Court. *See Pough v. United States*, No. 04-3863 (6th Cir. Jan. 12, 2005).

I also believe that this Court is proceeding with neither a brief by counsel *nor* a proper *pro se* brief by Petitioner. From the materials before this Court, it is not apparent that Petitioner was on notice that he was acting as his own counsel. Normally, when a petitioner represents himself *pro se* before this Court, there is no doubt that the petitioner and petitioner alone is responsible for the quality of legal argument on appeal. Here, the odd sort of relationship envisioned by Mr. Cocoves does not appear to place Petitioner on notice that his briefing of the legal issues would be the end game, *i.e.*, that his attorney would not lend his legal knowledge and capabilities, as well as his independent professional judgment, to properly framing Petitioner's issues on appeal. It hardly appears just to say to Petitioner, as this Court has, "We have appointed you counsel to help you in your appeal, you do not have to proceed *pro se*" and then, when counsel fails to perform, turn around and say, as the majority does, "Never mind, your argument fails anyway, even though you were not on notice that you were representing yourself." Even without the constitutional right to counsel on habeas, the "bait and switch" scenario created by the majority in this case certainly appears violative of due process.

Finally, the majority opinion expresses disagreement with the decision to have this opinion published on the questionable basis that Petitioner wrote a letter claiming that his safety in prison might be jeopardized by a published opinion. We as a Court do not make publication decisions, or indeed any decisions concerning the internal operations of the Court, based upon the unsupported and unsubstantiated allegations of an incarcerated prisoner. Interestingly, the majority, earlier in its opinion, itself rejects certain representations of Petitioner on the purported basis that "Pough could produce no facts to support his allegations." Although the majority would have us accept at face value Petitioner's representations concerning his safety, the majority opinion repeatedly questions Petitioner's veracity and credibility in discussing the allegations Petitioner has raised in connection with the merits of his appeal. It would be quite another thing had a prison official or a legitimate law enforcement official represented to the Court that Petitioner's safety might be jeopardized or asked that an opinion of this Court not be published for some reason that such officials regarded as credible. Tellingly, the majority opinion does not claim that any legitimate prison official or law enforcement official has ventured the opinion that publication in the instant case would jeopardize Petitioner's safety. It would be quite an oddity if this Court should begin to govern its decisions based solely on the unverified and unverifiable representations of incarcerated prisoners.

I would remove counsel of record, appoint new counsel, and reschedule this case for briefing and oral argument. That would be the only course of action consistent with the interests of Petitioner and this Court, both in requiring Petitioner to be adequately represented (as the Court has already determined, under prior order, that this case merits representation by counsel) and in sustaining our own authority as a Court. This Court should not countenance an admitted lack of representation when this Court has ordered otherwise. The majority's insistence on proceeding with this case under these circumstances is truly inexplicable. Because the majority insists on reaching

the merits of this case without Petitioner receiving the assistance of counsel which this Court saw fit to appoint, I must dissent.